**Jack HEATH, Plaintiff,**

v.

**ASPEN SKIING CORPORATION, a Colorado corporation, Aspen Highlands Skiing Corporation, a Colorado corporation, D. R. C. Brown, Tom Richardson, and Whipple V. N. Jones, Defendants.**

Civ. A. No. C–2890.

United States District Court,
D. Colorado.
March 30, 1971.

224

A. Bob Jordan, Oklahoma City, Okl., Carl R. Nutzhorn, Aspen, Colo., for plaintiff.

Ireland, Stapleton, Pryor & Holmes, by Monte D. Pascoe and Kenneth L. Starr, Denver, Colo., Holland & Hart, by William C. McClearn and James J. Moran, Denver, Colo., for defendants.

## MEMORANDUM OPINION

WINNER, District Judge.

Defendant Aspen Skiing Corporation operates three major ski areas in Pitkin County, Colorado. They are Aspen Mountain, Buttermilk and Snowmass-at-Aspen. Defendant Aspen Highlands Skiing Corporation operates a nearby major area, Aspen Highlands. Skiers come from throughout the fifty states and from many foreign countries to take advantage of the snow conditions available at these areas and other ski resorts in Colorado, among which are Vail, Breckenridge, Steamboat Springs, Keystone, Arapahoe, Loveland and Winter Park. The questions raised in this action are of importance to the western ski industry, because almost every major ski area in the west operates as a permittee of the United States Forest Service, and Forest Service regulations and policy are here under attack. The four areas involved have been granted 30-year Forest Service Temporary Use Permits, and nineteen percent of Aspen Mountain's trails, eighty percent of Buttermilk's trails, seventy-eight percent of the Snowmass trails and ninety-six percent of Aspen Highland's trails are on public land.

All of the permittees have built expensive lifts; all maintain ski patrols and all conduct ski schools headed by famous skiers.[1] Typically, the lower lift terminals, the hotels, lodges, restaurants and shops are on fee land, while the majority of the ski trails are on Forest Service land. The investment of each major area permittee is in the millions of dollars, and the area operators, the airlines, ski equipment manufacturers, and others, including the State of Colorado, have advertised nationally to attract skiers and to promote tourism. In recent years, skiing has become one of Colorado's major industries, and the state's development of the sport has resulted in the naming of Colorado as the site of the 1976 Winter Olympics.

It is against this background that plaintiff claims a right to conduct an independent ski school on lands to which defendants hold a Forest Service permit and on trails built by defendants at their own expense. We learn that plaintiff is and for more than ten years has been certified as a ski instructor by the Rocky Mountain Ski Instructors Association. This is a private organization which tests the qualifications of ski instructors, but it has no official sanction from any governmental agency, although it is the organization mentioned in the use permits as the certifying body for ski instructors. In his complaint, plaintiff avers:

"8. That since February, 1966, until mid-December, 1970, the plaintiff was an independent ski instructor, employing a rather unique style of skiing and instruction, although affiliated with a ski school operated through the defendant Aspen Highlands Skiing Corporation. That the plaintiff, as an independent businessman, solicited his own clients through the means of public advertisement and personal contact, scheduling the teaching thereof and receiving remuneration directly therefrom, paying a percentage of what he received to the ski school at Aspen Highlands Ski Area when teaching his clients at said area. That in the conduct of his business, the Plaintiff regularly contacted his clients, by United States mail and through the facilities of long distance telephone transmission lines and radio, often contracting therewith for his various clients to travel from the place of their residence (generally without the State of Colorado and usually by instruments of interstate commerce) to Aspen, Colorado, to there be instructed in the sport of skiing by the Plaintiff at one or more areas operated by the corporate Defendants. That on other occasions, clients of the Plaintiff travel to Aspen, Colorado, from their residency, (generally without the State of Colorado and utilizing instruments of in-

---

1. An Olympic medal has proven to be a ticket to a ski school directorship because of the promotional use the area can make of the medal winner's name.

terstate commerce) and there contract with the plaintiff to be taught the sport of skiing at one or more of the areas operated by the corporate Defendants. That the Plaintiff enjoyed a successful business."

The evidence established and the Court finds the foregoing averments to be true, except that plaintiff's agreement with Aspen Highlands was that he was to remit the gross amounts he received for ski instruction to Aspen Highlands and that defendant was to then pay sixty percent of those gross amounts to plaintiff; and except that the evidence was a bit queasy as to the nature of the success of plaintiff's business. Plaintiff testified that for his services as a ski instructor, he charged $25.00 per hour for a two hour minimum period; that he charged $20.00 per hour for a half day's instruction, and $100 for six hours of teaching. Thrown in as a fringe benefit to plaintiff's pupils was an uncertain quantity of health food of plaintiff's manufacture. He testified that he taught almost every day of the 1969–1970 ski season which was of about four months duration, and that ninety percent of his teaching was at Aspen Highlands; yet, at these stout hourly and daily rates, he paid Aspen Highlands only $1,500, and claimed to have netted only $900 for the season. With this testimony of plaintiff, it is not difficult for the Court to accept, and the Court does accept and finds to be true, the testimony of Aspen Highland's witnesses that plaintiff admitted to them that he was pocketing a substantial part of his gross teaching revenues without bothering to remit any part thereof to Aspen Highlands as he had agreed. As will be discussed later, this has bearing on the case for the reason that Aspen Highlands is required by the terms of its use permit to remit to the United States Government a percentage of *all* gross revenues derived on the area under threat of forfeiture of the permit if it does not do so. Plaintiff also testified that his books of account consisted of some notations made on a calendar; but, unfortunately, the calendar has been destroyed. This would present some slight problems to the Forest Service should it wish to conduct an audit of plaintiff's books. Permittees agree to such audits as a condition of the permit, and such audits are authorized by the use permits.

That plaintiff is a good ski instructor is not disputed. Defendants admit it, and in support of his application for a temporary restraining order, plaintiff submitted an affidavit from Ingo Preminger who, together with plaintiff's counsel, for some obscure reason thought that the Court should know this about Mr. Preminger:

"I am a producer of motion pictures. Among my works is the recently released film entitled M*A*S*H which has received the first prize at the Cannes Film Festival, was awarded the first prize by the National Association of Film Critics last month and was awarded the prize as Best Picture of the Year by the Foreign Film Critics. This latter prize is also known as the Golden Globe Award."

Following this interesting bit of incidental but immaterial intelligence, Mr. Preminger explained that he was a student of plaintiff and thought that Heath was "an outstanding instructor who has a rare talent of communicating to his students the exact way of improving their technique," and who said, "I consider it a grave curtailment of my rights not to be able to ski on National Forest land with the instructor of my choice."

Plaintiff charges in his complaint that defendants have refused to permit him to conduct an independent ski school at the ski areas they operate [a charge admitted by defendants] and that "Defendants did conspire together to eliminate from business all independent skiing instructors including Plaintiff, thereby totally monopolizing the ski school business in Pitkin County, Colorado." [a charge defendants deny.] Plaintiff then charges, and defendants deny, that "Defendants, by vertical amalgamation and integration, are totally restraining all free trade and commerce in the ski instruction business in said area, completely

eliminating all competition in said business by their acts and actions, the same being a violation of the anti-trust laws of the United States." Plaintiff could as well have sued every other major ski area in Colorado, because none of them allow paid ski instruction on their trails except through their own ski schools.

Although plaintiff's exact accusations against the Forest Service are not exactly clear, plaintiff does seem to say that the Forest Service cannot lawfully issue an exclusive permit to an area operator without violating 16 U.S.C. § 497, which provides in material part:

"The Secretary of Agriculture is authorized, under such regulations as he may make and upon such terms and conditions as he may deem proper, (a) to permit the use and occupancy of suitable areas of land within the national forests, not exceeding eighty acres and for periods not exceeding thirty years, for the purpose of constructing or maintaining hotels, resorts, and any other structures or facilities necessary or desirable for recreation, public convenience, or safety * * *. *The authority provided by this section shall be exercised in such manner as not to preclude the general public from full enjoyment of the natural, scenic, recreational, and other aspects of the national forests.*" [emphasis supplied.]

Plaintiff acknowledges that defendants have and that he has not obtained use permits from the Secretary of Agriculture under 16 U.S.C. § 497, but plaintiff reads the last sentence of that section to say that plaintiff can conduct his ski school as a profit making venture at any ski area operated on Forest Service land without necessity for obtaining a use permit. Somehow plaintiff reasons that once defendants obtain a permit, that permit inures to plaintiff's benefit. In arriving at this conclusion, Heath skips by the language of 16 U.S.C. § 551, which provides:

"The Secretary of Agriculture * * * may make such rules and regulations * * * as will insure the objects of such (forest) reservations, namely, *to regulate their occupancy and use* and to preserve the forests thereon from destruction; * * * *" [emphasis supplied.]

Nor, for some unclear reason, does plaintiff think that 36 C.F.R. § 261.11, Occupancy Trespasses, is applicable to him. That regulation says:

"*The following acts are prohibited on national forests or other land under Forest Service control;*

* * * * * *

"(b) * * * *conducting any kind of business enterprise * * * without a permit,* except as otherwise allowed by law or regulation." [emphasis supplied.]

Additionally, 36 C.F.R. § 251.1(a) (1) provides that "all uses of national forest lands, improvements, and resources * * shall be designated 'special uses' and shall be authorized by 'special use permits,'" although the same section does reserve to the public the right to use the forests for camping, fishing, hunting and similar recreational activities without requirement of a permit. An overall analysis of Part 251 of 36 C.F.R., however, can lead to no conclusion other than that all commercial uses of the National Forets are to be under the close scrutiny and control of the Forest Service, and that no commercial use may be made of the National Forests without a permit and without payment therefor to the Forest Service. Any argument that a ski school should be construed to be outside these requirements fails when the regulations are examined in their totality; and, certainly, an examination of the use permits issued to defendants conclusively establishes that the Forest Service believes that permits are required to operate ski schools on National Forest land. At time of trial, defendants introduced a letter from the Assistant Regional Forester outlining Forest Service policy as to ski schools which, to say the least, make plaintiff's chances of obtaining a

permit appear bleak. That letter, dated November 25, 1970, said:

"An individual or group may not instruct skiing or operate a ski school on a commercial basis at a developed ski area without authorization from the ski area operator. Ski areas are constructed and operated on National Forest land in accordance with the mutually agreed upon terms of a special use permit. These permits not only require that the permittee provide ski lifts, trails, service buildings, and utilities; but also authorize operation of ski schools. * * *

"Ski areas can be developed only if an individual or group is willing to invest capital. Consequently, these people are authorized to conduct a wide variety of public services acceptable to the Forest Service in conjunction with the skiing operation. This includes the operation of a ski school. * * *

"Permittees are required to pay a percentage of their income to the Forest Service in addition to providing certain public services. Therefore, they must have financial control or arrangements with all of the concessionaires or subcontractors operating as part of their area. *Consequently, we do not authorize other individuals to operate concessions or ski schools on a ski area being operated by another party without that other party's permission * * *"* [emphasis supplied].

The four permits here in question vary in their terminology, but in principle they are alike. All permits contain a provision in their printed portion that:

"The permittee, in exercising the privileges granted by this permit, shall comply with the regulations of the Department of Agriculture * * * which are applicable to the area or operations covered by this permit."

All of the permits require the payment to the Government of a percentage of net sales and "other income," and all permits include ski school receipts in their definition of "other income." The Snowmass permit, which is typical of the other permits, sets out a requirement for maintaining an accounting system and for audits of the permittee's books and records, and it specifically requires an acceptable "method of controlling tickets for lifts, tows, and ski school operations." Again referring to the Snowmass permit, in paragraph 24B, it authorizes a ski school to be conducted by the permittee in the following language:

"B. The permittee is authorized to conduct a ski school under the following conditions:

"(1) Special instruction areas for the use of the school will be approved by the Designated Forest Officer.

"(2) The use of slopes for instruction by the ski school will be regulated to prevent undue interference with public use. * * *"

All of the permits have requirements identical with or similar to the following, quoted from the Aspen Mountain permit:

"The Forest Service shall have the authority to check and regulate the adequacy and type of services provided the public and to require that such services conform to satisfactory standards."

Lastly, all of the permits say that, "This permit may be terminated upon breach of any of the conditions herein." Manifestly, under both the policy of the Forest Service and the terms of the use permits, were defendants to allow plaintiff to teach skiing for hire on the permit areas as an independent contractor, the permits might be subject to termination—especially under plaintiff's accounting procedures. Plaintiff challenges the lawfulness of, (1) the permits, (2) the Forest Service policy, and (3) either the regulations themselves, or the construction placed on the regulations by the Secretary of Agriculture. Because of these attacks, defendants have moved to

dismiss on the ground that the Secretary of Agriculture is an indispensable party.[2]

■ ■ Amended Rule 19 requires joinder of a person subject to service of process if, "(1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may * * * leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest." If such person "cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Clearly, the Secretary of Agriculture is a person who should be before the Court under the tests set forth in Rule 19. See, Ogden River Water Users Ass'n v. Weber Basin Water Conservancy (10 Cir.), 238 F.2d 936; Franz v. East Columbia Basin Irrigation District (9 Cir.), 383 F.2d 391; Richman v. Beck (10 Cir.), 257 F.2d 575; McNeil v. Leonard (D.C.Mont.), 199 F.Supp. 671 and Texas American Asphalt Corp. v. Walker (D.C.S.D.Tex.), 177 F.Supp. 315. However, the philosophy of present Rule 19 is to avoid dismissal whenever possible, and, although the case would not be permitted to proceed to a judgment invalidating the permits or placing the permits in jeopardy without the presence of the Secretary of Agriculture, his presence could be obtained.

28 U.S.C. § 1391 was amended in 1962 to add subparagraph (e) which provides:

"(e) A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which: (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action."

A literal reading of subparagraph (e) would mean that since the present defendants are not federal officers, the Secretary of Agriculture could not be sued in Colorado in this case. Such a result would defeat the clear purpose of 28 U.S.C. § 1391(e), and Chief Judge Arraj of this District has heretofore so held. In Brotherhood of Locomotive Engineers v. Denver and Rio Grande Western Railroad Company (D.C.Colo.), 290 F.Supp. 612, the contention that § 1391 (e) applies only when all defendants are officers or employees of the Federal Government was rejected. It was there said:

"Though the literal wording of the statute and one case which follows that literal wording, Chase Savings & Loan Ass'n v. Federal Home Loan Bank Board, 269 F.Supp. 965 (E.D. Pa.1967), support the N M B's position, this Court is of the opinion that the absurd result which derives from such a construction should be avoided and that instead the spirit and purpose of section 1391(e) should be adhered to in accord with the decision in Powelton Civic Home Owners Ass'n v. Department of Housing & Urban Dev., 284 F.Supp. 809 (E.D.Pa.1968).

"The evident legislative purpose behind section 1391(e) was simply to alleviate the burdensome situation under prior service and venue rules which could force a plaintiff suing federal officers or agencies to bring his ac-

---

2. The case was first twice heard on motion for temporary restraining order, and later on the requests for a preliminary and permanent injunction. These were combined into a single hearing by order of Court and by agreement of the parties.

For that reason, defendants' motions were not argued until time of trial on the merits; and, although the motions are dispositive of the case, the Court makes full findings of fact in this opinion.

tion in the District of Columbia regardless of other circumstances, see U.S.Cong. & Admin.News, 2784–90 (1962), and to deny its applicability in the instant case would serve no apparent end. Further, acceptance of defendants' tendered interpretation would likely make it impossible for plaintiff to prosecute in a single suit an action such as the present at all since the defendants other than the N M B could probably not be served in the District of Columbia nor would venue properly line in that district as to those other defendants."

Had there not been a consolidated hearing on the motions and the merits of the case because of plaintiff's cry of dire emergency, the Court would not have reached the merits without ordering joinder of the Secretary of Agriculture, but in light of the disposition to be made of the case, his joinder at this stage would serve no valid purpose, and the case will be finally disposed of without present requirement for his joinder.

■ The Court rejects plaintiff's contention that 16 U.S.C. § 497 renders invalid any of the mentioned regulations in 36 C.F.R., Part 251, and the Court expressly finds and concludes that the quoted regulations and policy of the Forest Service applicable to ski schools are reasonable, authorized, lawful and in the public interest. It is clearly in the public interest to have well developed, financially sound ski areas, and unless investors who are willing to abide by Forest Service regulations are given some protection against fly-by-nights who have no permit, such investors cannot be expected to risk their capital in the development of a new and unproven area. Moreover, it is the policy of the Forest Service that the Government realize a percentage of all income derived from permit areas, and to allow anyone and everyone to teach for hire would create a situation the Forest Service could not police. Heath's bookkeeping methods are the perfect example of the chaos which would result if the Forest Service tried

to audit his ski school income. Neither plaintiff nor anyone else has either a constitutional or statutory right to derive income from an unlicensed use of the public's property.

■ The complaint here asserts that jurisdiction is founded upon the antitrust laws, and in paragraph 15, it is said:

" * * * That said acts alleged were in restraint of free trade and commerce among the citizens of several states, intended as such, with each and every act in violation of the antitrust laws of the United States and other public laws, and do and did create, produce and constitute a monopoly, and were intended to, having the effect of entirely monopolizing the ski school business in the Aspen, Colorado, area, by eliminating from business all independent ski instructors, including the plaintiff, thereby eliminating competition in geographical area for services rendered in interstate commerce and depriving the general public from full enjoyment of the recreational and other aspects of the national forest."

Other averments of the complaint are that defendants advertise on a national basis in publications that are distributed in interstate commerce and that a substantial portion of the patrons of the ski areas travel in interstate commerce to reach Aspen. Additionally, plaintiff testified that almost all of his students travel in interstate commerce to seek out his services. These things, plus the purchase of materials and supplies from out of state, plaintiff says, are a sufficient connection with commerce to bring the case within the ambit of the antitrust laws. Plaintiff relies on cases such as Bowl America, Inc. v. Fair Lanes, Inc. (D.C.Md.), 299 F.Supp. 1080; Washington State Bowling Prop. Ass'n v. Pacific Lanes, Inc. (9 Cir.), 356 F.2d 371; Marriott Hotels of Atlanta, Inc. v. Heart of Atlanta Motel, Inc. (D.C.N.D.Ga.), 232 F.Supp. 270; and, most strongly on Aspen Skiing Corporation, 143 N.L.R.B. 707, where the National Labor Relations

Board said as to defendant Aspen Skiing Corporation:

"* * * at least 50 percent of the Employer's operations are conducted on Federal property and are subject to extensive Federal regulations through the Forest Service. This endows it with more than a purely local interest. Additionally, 65 percent of the skiers who use the Employer's facilities have traveled to the Employer from out of State, and, as indicated, the Employer spends substantial sums on national advertising and in the purchase of materials originating outside the State of Colorado. In this case we find that the Employer's operations have a close, intimate, and substantial relation to trade, traffic, and commerce among the States, and that the Employer is engaged in commerce within the meaning of the Act."

Defendants counter by saying that the test of interstate commerce is different under the antitrust laws than it is under the labor laws, and defendants rely on cases such as Hotel Phillips, Inv. v. Journeymen Barbers, etc., (8 Cir.), 301 F.2d 443; Marston v. Ann Arbor Property Managers (Management) Ass'n (6 Cir.), 422 F.2d 836; Evanston Cab Co. v. City of Chicago (7 Cir.), 325 F.2d 907, and most strongly on Spears Free Clinic and Hospital for Poor Children v. Cleere (10 Cir.), 197 F.2d 125. In Spears an antitrust violation was pleaded, and plaintiff there charged that the county medical society and its members conspired to monopolize the healing arts and to prevent the licensing of a chiropractic hospital whose patients came from throughout the country. The trial court's dismissal of the complaint was affirmed by the Tenth Circuit and it was there said:

"Where, however, the object and purpose is to restrain or monopolize activities or matters purely local in character, those facts may be considered in determining whether the effect on interstate or foreign commerce is direct and substantial or only incidental, indirect and remote. * * *

"The practice of the healing arts in Colorado, including chiropractic, is wholly local in character. The alleged conspiracy and the acts alleged to have been done in furtherance thereof had for their purpose and object the monopolization and restraint of purely local activities. * * * The mere fact that a fortuitous and incidental effect of such conspiracy and acts may be to reduce the number of persons who will come from other states and countries to the Spears Hospital for chiropractic treatment does not create such a relation between interstate and foreign commerce and such local activities as to make them a part of such commerce."

Here, however, the relationship between defendants' business and commerce is much more direct and substantial than was the case in Spears. The use of instrumentalities of commerce by ski area patrons is much more frequent; materials are bought in commerce; and the thrust of the joint and state aided advertising campaign of the Colorado ski industry under its slogan "Ski Country U.S.A." is to attract out-of-state skiers to Colorado. The air lines have applied for and have been granted special tariffs for the transportation of ski equipment, and a visit to the Denver airport on any weekend during ski season convinces as to the extensive use of interstate transportation facilities by the skiing public. Accordingly, admitting that the test of commerce under the labor laws differs from that applied in antitrust, the Court finds and concludes that here there is a direct and substantial connection between defendants' business and interstate commerce, and the Court finds that plaintiff has sustained his burden of proving that defendants' activities do have the necessary effect on interstate commerce to confer jurisdiction on that score.

However, this very argument of plaintiff's is in part self-defeating. Plaintiff attempts to limit his monopoly claim to the ski areas in Pitkin County, Colorado, and he argues that other ski

areas in the state (all of which have ski schools) are not competitive. The very interstate travel which plaintiff so vigorously asserts in support of his interstate commerce arguments is the same travel which brings skiers to all of the areas in the state and is the same travel which makes all of the state's areas competitive. To reach Aspen, persons landing at the Denver airport and driving to Aspen must pass six ski areas in open and direct competition with defendants. Plaintiff's charges of monopoly and attempts to monopolize are just not well founded. He cannot by his own ipse dixit limit the competitive area to Pitkin County when in fact the competition for the ski trade is nation wide. From all of the evidence, the Court finds that defendants have no monopoly; that they have not attempted to create a monopoly; and, with equal emphasis, the Court finds that there was no conspiracy.

In oral argument plaintiff's counsel made much of D. R. C. Brown's answer to an extremely leading question. Brown, speaking for Aspen Skiing Corporation, answered that he was trying to prevent competition. Taken out of context, this statement would be evidence of an attempt to monopolize, but in context, all that Brown was saying was that under the Forest Service permit, regulations and policy, Aspen Skiing Corporation couldn't allow plaintiff to run his underground ski school without violating the corporation's obligations to the Forest Service.

The prohibition against plaintiff's activities stems from the Forest Service policy of allowing only one ski school permit per area and we have held this to be proper governmental action. This, by itself, defeats plaintiff's claim, for, as was said in Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, "Where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." To the same effect are E. W. Wiggins Airways, Inc. v.

Massachusetts Port Authority (1 Cir.), 362 F.2d 52 and Export Liquor Sales, Inc. v. Ammex Warehouse Co. (6 Cir.), 426 F.2d 251.

Moreover, portions of the ski trails lie on private land, and a landowner can certainly choose the persons he wishes to conduct a business on his own land. This was the holding of Savon Gas Stations Number Six, Inc. v. Shell Oil Co. (4 Cir.), 309 F.2d 306, where it was said:

"We do not think that the restriction imposed upon the defendant by the exercise of the right of the Shopping Center to choose the persons who were allowed to do business on its property amounted to an unreasonable restraint of trade within the purview of the Federal Statutes."

Finally, but conclusively, in Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Co., (decided March 12, 1971) 440 F.2d 36, the United States Court of Appeals for the Tenth Circuit effectively disposed of plaintiff's claims here. In that antitrust case Cottonwood claimed a right to supply its shopping center tenants with electricity generated in its own power plant. Cottonwood charged Power Company with monopoly because Power Company claimed the exclusive right to sell electricity in the Shopping Center. The Tenth Circuit said:

"Cottonwood, owner and operator of a large shopping center in the trade area of Salt Lake City sued Power Company alleging that Power Company had attempted to monopolize the market for electrical power at the Center and had interfered with existing contracts of Cottonwood to provide electricity for J. C. Penney Company, a tenant on the Mall. The basic question is put in issue by the defense that Cottonwood lacks the necessary Certificate of Public Convenience from the Utah Public Service Commission and therefore cannot challenge these economic activities of Power Company. *The Court below gave summary judgment to Power Company on the ground that Cotton-*

*wood would need a Certificate before it could press its claims, for if it had no right to sell electricity, then by definition Power Company could not interfere with this 'right.'"* [emphasis supplied.]

The Court of Appeals affirmed. If Cottonwood had no right to bring an antitrust action until it obtained a Certificate of Public Convenience, Heath has no claim until he obtains a temporary use permit from the Forest Service.

In summary, the Court finds and concludes:

1.  The Secretary of Agriculture is a necessary party, and if relief were to be granted against defendants, his joinder would be necessary and could be accomplished under 28 U.S.C. § 1391(e).

2.  16 U.S.C. § 497 does not authorize commercial use of National Forest lands without a use permit.

3.  The regulations of the Secretary of Agriculture and the policy of the Forest Service having to do with commercial uses of Forest Service land and with the conduct of ski schools on Forest Service land are authorized, reasonable and lawful.

4.  Plaintiff has no right to teach skiing for hire as an independent contractor on lands to which defendants hold a temporary use permit for the operation of a ski area, and defendants may take all reasonable steps to bar him for such teaching. However, the Court does not pass upon and expresses no opinion as to the right of defendants to bar plaintiff from any use of the ski areas because of his past conduct. The Court's opinion is limited to upholding defendants' right to prohibit plaintiff from teaching for hire.

5.  There is a direct and substantial connection between defendants' business and interstate commerce within the meaning of the antitrust laws.

6.  Plaintiff has failed to prove either a monoply, an attempt to monopolize or a conspiracy on the part of defendants.

7.  Defendants and all of the other major ski areas in the state, as well as the ski schools conducted at all of those areas are in free, open and vigorous competition with each other.

8.  Since plaintiff has no use permit allowing him to make commercial use of National Forest lands, he has no right to make such a use of them and he has no claim against defendants under the antitrust laws.

Whether defendants' motions be treated as motions to dismiss, or as motions for summary judgment, absent pleading and proving a right to teach skiing for hire, plaintiff has neither stated nor proven a claim for relief.

It Is Ordered that plaintiff's complaint be dismissed.