604 F.2d 652
 CA 79-3197 ESTATE OF William G. ZARITZ, By and Through its
Representative Leroy ZARITZ, and Leroy Zaritz and
Kotono T. Zaritz, Plaintiffs-Appellants,
v.
The MANITOU AND PIKES PEAK RAILWAY COMPANY, a Colorado
Corporation, Defendant-Appellee.
 No. 78-1111.
 United States Court of Appeals,
Tenth Circuit.
 Submitted July 18, 1979.
Decided Aug. 24, 1979.
 
 John B. Ciccolella, Colorado Springs, Colo., for plaintiffs-appellants.
 Ben S. Wendelken, Colorado Springs, Colo. (William J. Hybl, Colorado Springs, Colo., with him on the brief), for defendant-appellee.
 Before SETH, HOLLOWAY and BARRETT, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Plaintiffs-appellants, hereinafter referred to as Zaritz, seek review of a final order of the District Court granting defendant-appellee's, hereinafter referred to as Pikes Peak Railway, motion for summary judgment.
 
 
 2
 The parties agree that there are no genuine issues as to any material fact. Thus, the issues presented were directed to the court's determination of matters of law. For purposes of appellate review we are guided by the principle that summary judgment cannot be granted unless the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.Rules Civ.Proc., rule 56(c), 28 U.S.C.A.; Ando v. Great Western Sugar Company, 475 F.2d 531 (10th Cir. 1973).
 
 Factual Background
 
 3
 William G. Zaritz was employed with Pikes Peak Railway in the spring and summer of the years 1972 and 1973. The Railway operates a nine (9) mile scenic attraction, known as a "cog" railroad. It operates on a special type of railroad track with a large rack rail in the middle. The tracks cannot be used by any other railway operating in Colorado.
 
 
 4
 The "ticket station" from whence the Pikes Peak Railway commences its 9 mile journey to the top of Pikes Peak, and to which it returns, is located within the City of Manitou Springs, Colorado. It is part of the general "tourist attractions" in the Colorado Springs, Colorado, area. The Pikes Peak Railway operates under regulations of the Colorado Public Utilities Commission. Its fares are subject to the approval of the Commission. The Interstate Commerce Commission does not regulate or exercise any jurisdiction over Pikes Peak Railway.
 
 
 5
 Tickets may be purchased by passengers only at Pikes Peak Railway station in Manitou Springs. About 90 percent of the passengers are non-residents of Colorado on vacation tours. The nearest rail passenger service route is 70 miles away. The Pikes Peak Railway does not connect with any other railroad or another form of transportation.
 
 
 6
 On June 21, 1973, William G. Zaritz was fatally injured while working on the roadway by a Pikes Peak Railway train. Following his death, a Workmen's Compensation claim was filed by the representative of Zaritz's estate and the claim has been processed, approved and awarded.
 
 District Court Litigation
 
 7
 On January 19, 1976 Zaritz filed this action in the District Court seeking recovery of damages resulting from the injury and death of William G. Zaritz based, Inter alia, upon jurisdiction invoked under the Federal Employers' Liability Act, 45 U.S.C.A. Sec. 51, Et seq., and the Federal Safety Appliance Act, 45 U.S.C.A. Sec. 1, Et seq.
 
 
 8
 45 U.S.C.A. Sec. 51 renders "(e)very common carrier by railroad While engaging in commerce between any of the several States . . . liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving . . ."
 
 
 9
 45 U.S.C.A. Sec. 1 provides that "(i)t shall be unlawful for any common carrier Engaged in interstate commerce by railroad to use on its line any locomotive engine in Moving interstate traffic not equipped with . . . or . . ."
 
 
 10
 The District Court, following extensive briefing, and two hearings, found that Pikes Peak Railway Was not engaged in interstate commerce and, thus, not subject to the aforesaid federal acts. In the course of the first hearing held on October 6, 1977, the District Court suggested that counsel undertake further research in regard to the legal distinction drawn from the decisions interpretive of the terms "affect on interstate commerce" and "engaged in interstate commerce". (R., Vol. II, pp. 9, 10). The subsequent hearing was held on November 28, 1977. The court referred to its decision in Heath v. Aspen Skiing Corporation, 325 F.Supp. 223 (D.C.Colo.1971) and, for purpose of the hearing, suggested that the parties assume (as held in Heath, supra ) that the Pikes Peak Railway operation does have an "affect on interstate commerce" and direct their remarks to the statutory language "engaged in interstate commerce." (R., Vol. III, pp. 12-18). The following colloquy transpired:
 
 
 11
 The Court : But for the purpose of your argument today, I will assume that the cog road attracts people into the State of Colorado, and for the sake of your argument today, I'll assume that the existence of the cog railroad does have an (e)affect on interstate commerce . . . But with those assumptions, I would like to have you direct your argument to: what difference does it make? In other words, what I am saying is this: Is the test an "(e)affect on" interstate commerce under the Federal Employers Liability Act, or is the test "engaged in" interstate commerce?
 
 
 12
 Now, as you approach the problem, give me some explanation of these comparatives: Is the train or monorail which I have ridden in Orlando, Florida, leading from the gate of Disneyland over to the place where they have the exhibits, is that in interstate commerce?
 
 
 13
 Is the monorail leading up one of the principal streets of Seattle . . . (leading) . . . out to the Space Needle, is that in interstate commerce?
 
 
 14
 Is the miniature train at Elitch's Gardens . . . in interstate commerce?
 
 
 15
 Mr. Ciccolella : if I may draw an analogy to the monorail in both Disney World, the monorail in Seattle, and leaving aside for the moment the train at Elitch Gardens which I am not personally familiar with.
 
 
 16
 The Court : Oh, it's a cute little train.
 
 
 17
 Mr. Ciccolella : . . . counsel for the defendants have noted . . . a couple of cases involving taxicabs, which isn't too far off of the monorail type of situation.
 
 
 18
 There the courts note the taxicabs going to and from airports, even though they transport the people much as the monorail does from downtown Seattle out to the World's Fair area . . . is not in interstate commerce.
 
 
 19
 The Court : And yet they're actually transporting people from their hotel to a common carrier engaged in interstate commerce. It's a continuous thing . . . the Yellow Cab case had to do with trips to and from the railroad station. But as I understand it, unless the Supreme Court changes its mind, that a taxicab transporting passengers from the Brown Palace Hotel to the Denver airport, or from the Broadmoor to the Colorado Springs airport . . . that cab company is not in commerce. Isn't that right?
 
 
 20
 Mr. Ciccolella : I believe that's correct, Your Honor.
 
 
 21
 The Court : All right.
 
 
 22
 Mr. Ciccolella : Because that is collateral to the commerce and flow of commerce which the people are in.
 
 
 23
 The Court : But it has much more affect on it than the cog road. Now, the cog road, people have to get there by one means or another, but the taxicab, it's a continuous operation. You only lay over as long as the plane happens to be late, plus thirty minutes, and that's all it is.
 
 
 24
 Mr. Ciccolella : . . . I think what the Court must look at in that situation is much as the Court has to look at the barber shop within O'Hare Field in Chicago and, that is: Do the people travel there to O'Hare Field for the purpose of riding a cab or getting a haircut? And certainly they don't, but they do leave their homes for the purpose of engaging in the commercial activity of tourism when they leave on vacations and head for Kansas City.
 
 
 25
 The Court : That argument would make the Broadmoor Hotel in commerce. There are a lot more people who travel to Colorado Springs to stay at the Broadmoor Hotel than people who ride the cog rail.
 
 
 26
 Mr. Ciccolella : That is correct, and I think the hotel is engaged in that commerce.
 
 
 27
 The Court : I think its business may affect commerce. I don't think it's engaged in commerce.
 
 
 28
 (R., Vol. III, pp. 12-17).
 
 
 29
 Counsel for Zaritz argued that, in line with his theory, the controlling decision is that of Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Reliance thereon, it seems to us, is basically anchored to Zaritz's contentions that the terms "affected" and "engaged in" interstate commerce are not mutually exclusive (with which the trial court concurred but pointedly remarked that if one's activity "affects" commerce it does not necessarily mean he is "engaged in" commerce); that if a railway such as Pikes Peak Railway is capable of injuring People who are in interstate commerce (tourists), then such injury Hinders commerce, bringing the Federal Liability Act and Safety Appliance Act into play and placing the Pikes Peak Railway in interstate commerce. (R., Vol. III, pp. 22-24).
 
 
 30
 The District Court granted the motion for summary judgment on the ground that the Pikes Peak Railway was not engaged in interstate commerce. The court stated that "I don't think Congress was speaking loosely when they said 'while engaging in commerce' between any of the several states or territories; and when Congress says engages in interstate commerce . . . it is absolutely impossible to hold this plaintiff is engaging in interstate commerce." (R., Vol. III, p. 35).
 
 Issues on Appeal
 
 31
 Appellant poses the issue presented for our review as follows: Is the transportation of interstate travelers by a railroad located entirely within Colorado and existing for and because of the interstate traveler interstate commerce as that term is defined by the Federal Employer's Liability Act, 45 U.S.C.A. Sec. 51 Et seq., and the Safety Appliance Act, 45 U.S.C.A. Sec. 1 Et seq.
 
 Opinion
 
 32
 Zaritz has persistently concentrated on the interstate nature of the tours which the bulk of persons who purchase tickets and use the Pikes Peak Railway engage in, rather than the "interstate" character of operations the railway is engaged in. This, in our view, is the fatal flaw in Zaritz's case.
 
 
 33
 A starting point is Philadelphia & Reading Railway Company v. Hancock, 253 U.S. 284, 40 S.Ct. 512, 64 L.Ed. 907 (1920). There, cars of coal were loaded at a mine site in Pennsylvania, Destined for delivery beyond that state : moved some two miles to a rail yard where they were to be "made up" in a train; then moved to a weighing station, to be weighed and billed for specific consignment in another state. The Court, in applying the Federal Employer's Liability Act, held that the very first movement of the freight was part of an interstate movement:
 
 
 34
 The duties of the deceased (trainman) never took him out of Pennsylvania; they related solely to transporting coal from the mines. When injured he belonged to a crew operating a train of loaded cars from Locust Gap Colliery to Locust Summit yard, two miles away. The ultimate destination of some of these cars was outside of Pennsylvania . . .
 
 
 35
 . . . In due time they (the cars) passed to their final destinations over proper lines . . .
 
 
 36
 . . . Respondent maintains that the coal in cars ticketed for transportation . . . did not become part of interstate commerce until such cars reached Shamokin scales where they were weighed and billed. But we think former opinions of this court require the contrary conclusion. The coal was in the course of transportation to another state when the cars left the mine. There was no interruption of the movement; it always continued toward points as originally intended. The determining circumstance is that the shipment was but a step in the transportation of the coal to real and ultimate destinations in another state.
 
 
 37
 253 U.S. at pp. 285, 286, 40 S.Ct. at pp. 513.
 
 
 38
 By contrast, in the instant case those passengers who board the Pikes Peak Railway as tourists from outside of Colorado In fact interrupt their interstate movement because the Pikes Peak Railway simply transports them to Pikes Peak and returns to the Manitou Springs station without Any connection to any form of carrier moving interstate.
 
 
 39
 In Merchants Fast Motor Lines, Inc. v. Interstate Commerce Commission, 528 F.2d 1042 (5th Cir. 1976), the court said, Inter alia :
 
 
 40
 It is elemental that a carrier is engaged in interstate commerce when transporting goods either originating in transit from beyond Texas or ultimately bound for destinations beyond Texas, even though the route of the particular carrier is wholly within one state. Traffic need not physically cross state lines to be in interstate commerce, if the goods carried are in the course of through transit. "Through" is not to be confused with purely "local" traffic not destined for points outside the state of origin. (citations omitted).
 
 
 41
 528 F.2d at p. 1044.
 
 
 42
 Applying the facts in the case at bar to the aforesaid language quoted from Merchants, supra, there is not a scintilla of evidence that those out-of-state passengers (tourists for our purpose here) who travel the round-trip on the Pikes Peak Railway are doing so in furtherance of "through" transit of interstate character. In truth, the "side excursion" on the Pikes Peak Railway is purely "local" simply because it does not further any of the passengers' interstate travel. Instead, it interferes with their interstate movements for the period of time while involved on the trip.
 
 
 43
 In United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), the contention was advanced that the Yellow Cabs transporting passengers from various points in Chicago to and from railroad stations where the passengers either departed from or boarded trains involved in interstate journeys were sufficiently involved in interstate commerce to justify the application of the Sherman Act. The Supreme Court held that the Yellow Cab transportation was too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. Declaring the relationship of Yellow Cabs' transportation activities as simply "casual and incidental" to interstate commerce, the court observed:
 
 
 44
 Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movements when he boards the train at the station and that his journey ends when he disembarks at the station in the city of his destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoint of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare.332 U.S. at p. 231-232, 67 S.Ct. at p. 1567.
 
 
 45
 The District Court stated that, in his view, United States v. Yellow Cab Co., supra, "is unanswerable" by Zaritz insofar as it relates to the distinction drawn by the Congress under the Federal Employers' Liability Act and other statutes interpretive of the language "affecting interstate commerce" and "engaged in interstate commerce". We agree. The District Court's observation is pertinent inasmuch as Zaritz, on appeal, finds solace in that Court's finding and conclusion in Heath v. Aspen Skiing Corp., supra. Such reliance is misplaced. The issue in that case was whether the activities pursued at the three ski resort areas maintained by Aspen Skiing Corp. had a Direct and substantial connection with interstate commerce. The court found that they did and observed:
 
 
 46
 * * * The use of instrumentalities of commerce by ski area patrons is much more frequent; materials are bought in commerce; and the thrust of the joint and stated aided advertising campaign of the Colorado ski industry under its slogan "Ski Country U.S.A." is to attract out-of-state skiers to Colorado. The airlines have applied for and have been granted special tariffs for the transportation of ski equipment, and a visit to the Denver airport on any weekend during ski season convinces one as to the extensive use of the interstate transportation facilities by the skiing public.
 
 
 47
 325 F.Supp. at p. 231.
 
 
 48
 Thus the District Court found, the facts in Heath, supra, that the Activities undertaken did bring that case within the anti-trust laws because of their substantial and direct affect upon interstate commerce. Heath, supra, does not, however, stand for the proposition that the Aspen Skiing Corp. was engaged in interstate commerce. The finding there was that there was a direct and substantial relationship between the business and interstate commerce.
 
 
 49
 Zaritz's reliance on Heart of Atlanta Motel v. United States, supra, is misplaced. In that case, the action was brought under the Civil Rights Act which conferred jurisdiction specially to "any place of public accommodation" providing lodging to transient guests "(if its) operations affect commerce, or if discrimination or segregation by it is supported by State action." (Emphasis supplied.)
 
 
 50
 Plainly, then, both the Congress and the United States Supreme Court have recognized and distinguished the difference between the terms "affect interstate commerce" and "engaged in interstate commerce". The distinction between the language "affect interstate commerce" and "engaged in interstate commerce" was, we believe, pinpointed interpretive of the reach of the Federal Employers' Liability Act, as amended in 1939, in Reed v. Pennsylvania Railroad Co., 351 U.S. 502, 76 S.Ct. 958, 100 L.Ed. 1366 (1956). There the court held that Reed, a clerical employee of an interstate railroad whose office duties were performed exclusively in Philadelphia, was within the coverage of the Act, by reason of a 1939 amendment, when she was injured in her office when a cracked window pane blew in on her. The court stated:
 
 
 51
 As originally enacted, Sec. 1 provided that every railroad, "while engaging" in interstate commerce,
 
 
 52
 "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 35 Stat. 65.
 
 
 53
 A further paragraph was added to the section in 1939, and it is clear that two specific problems which the amendment sought at least to remedy were the results of this Court's holdings that, at the moment of his injury, the employee as well as the railroad had to be engaged in interstate commerce in order to come within the coverage of Sec. 1, and that employees engaged in construction of new facilities were not covered. S.Rep.No. 661, 76th Cong., 1st Sess. 2-3; Southern Pacific Co. v. Gileo, 351 U.S. 493, 76 S.Ct. 952, (100 L.Ed. 1357). The amendment took the form of an expanded definition of "person . . . employed" in interstate commerce. The amendment reads:
 
 
 54
 "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this Act, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this Act . . . ." 53 Stat. 1404.
 
 
 55
 No argument is made that Congress could not constitutionally include petitioner within the coverage of the Act. The argument is that the amendment was narrowly drawn to remedy specific evils and that to construe it to include petitioner would amount to inclusion in the Act of virtually all railroad employees a result which respondent assumes is unintended and undesirable. The argument takes several forms. First, it is said that "commerce" in the Act means only transportation and that petitioner is not employed in transportation. See Shanks v. Delaware, L. & W. R. Co., 239 U.S. 556, 559-560, 36 S.Ct. 188, 190, 60 L.Ed. 436. But the interstate commerce in which respondent is engaged is interstate transportation. If "any part" of petitioner's duties is in "furtherance" of or substantially affects interstate commerce, it also is in "furtherance" of or substantially affects interstate transportation. The test for coverage under the amendment is not whether the employee is engaged in transportation, but rather whether what he does in any way furthers or substantially affects transportation. Nor can we resolve the issue presented here in terms of whether or not clerical employees as a class are excluded from the benefits of the statute. The 1939 amendment was designed to obliterate fine distinctions as to coverage between employees who, for the purpose of this remedial legislation, should be treated alike. There is no meaningful distinction, in terms of whether the employee's duties are clerical or not, between petitioner and, for illustration, an assistant chief timekeeper, Straub v. Reading Co., 3 Cir., 220 F.2d 177, or a messenger boy carrying waybills and grain orders between separate local offices and freight stations, Bowers v. Wabash R. Co., 246 S.W.2d 535 (Mo.App.), or a lumber inspector hurt while inspecting ties at a lumber company Ericksen v. Southern Pacific Co., 39 Cal.2d 374, 246 P.2d 642 all of whom have been held covered by the 1939 amendment. See also Lillie v. Thompson, 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73. Nor are the benefits of the Act limited to those exposed to the special hazards of the railroad industry. The Act has not been so interpreted, and the 1939 amendment specifically affords protection to "any employee" whose duties bring him within that amendment. There is no basis in the language of Sec. 1 for confining liability of the railroad so as to exclude any class of railroad employees as a class. The benefits of the Act are not limited to those who have cinders in their hair, soot on their faces, or callouses on their hands. Section 1 cannot be interpreted to exclude petitioner from its benefits without further consideration of the function she performs and its impact on interstate commerce.
 
 
 56
 We think that the present petitioner is employed by the respondent in interstate commerce within the meaning of the 1939 amendment to Sec. 1. Although the amendment may have been prompted by a specific desire to obviate certain court-made rules limiting coverage, the language used goes far beyond that narrow objective. It evinces a purpose to expand coverage substantially as well as to avoid narrow distinctions in deciding questions of coverage. Under the amendment, it is the "duties" of the employee that must further or affect commerce, and it is enough if "any part" of those duties has the requisite effect. The statute commands us to examine the purpose and effect of the employee's function in the railroad's interstate operation, without limitation to nonclerical employees or determination on the basis of the employee's importance as an individual in the railroad's organization.
 
 
 57
 351 U.S. at pp. 504-506, 76 S.Ct. at pp. 960-962.
 
 
 58
 The Reed v. Pennsylvania Railroad Co., supra, holding was that:
 
 
 59
 . . . the petitioner, by the performance of her duties, is furthering the interstate transportation in which respondent is engaged . . .
 
 
 60
 Similarly, those duties which "in any way directly or closely and substantially affect" interstate commerce in the railroad industry must be necessarily marked out through the process of case-by-case adjudication. This definition and the "furtherance" definition of employment in interstate commerce in the 1939 amendment are set forth in the disjunctive. In some situations they may overlap.
 
 
 61
 351 U.S. at p. 507, 76 S.Ct. at p. 962.
 
 
 62
 Finally, we observe that in Edwards v. Pacific Fruit Express Co., 390 U.S. 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968), the Supreme Court held that respondent Pacific Fruit Express Company was not a "common carrier by railroad" engaged in interstate commerce subjecting it to damages under the Federal Employer's Liability Act, even though it was the largest company of its kind in the United States, and:
 
 
 63
 It owns, maintains and leases refrigerator cars to railroads to transport perishable products in commerce. Because it repairs its own cars, it also owns buildings, plants, switching tracks, and equipment to make these repairs. While the railroads to which its cars are leased transport them as directed, the respondent Express Company reserves the right to have the cars diverted to carry out its own business plans . . .
 
 
 64
 In conducting its business of providing and servicing insulated railroad cars for the carriage of perishable commodities, it is undoubtedly true that respondent performs some railroad functions. For example, it maintains and takes care of railroad cars which are leased to railroads for transportation in interstate commerce. It services these cars while in transit and controls their eventual destination. And respondent has yards and facilities for the repair and storage of its refrigerator cars . . .
 
 
 65
 In 1939 Congress substantially amended the Federal Employers' Liability Act . . . By refusing to broaden the meaning of railroads, Congress declined to extend the coverage of the Act to activities and facilities intimately associated with the business of common carrier by railroad.
 
 
 66
 390 U.S. at pp. 539 and 541, 88 S.Ct. at pp. 1239 and 1240.
 
 
 67
 Accord: Chaneyfield v. City of New York, 525 F.2d 1333 (2nd Cir. 1975), Cert. denied, 425 U.S. 912, 96 S.Ct. 1509, 47 L.Ed.2d 763 (1976); McCrea v. Harris County Houston Ship Channel Navigation District , 423 F.2d 605 (5th Cir. 1970), Cert. denied, 400 U.S. 927, 91 S.Ct. 189, 27 L.Ed.2d 186 (1970); Aho v. Erie Mining Company, 466 F.2d 539 (8th Cir. 1972); Evanston Cab Co. v. City of Chicago, 325 F.2d 907 (7th Cir. 1963), Cert. denied, 377 U.S. 943, 84 S.Ct. 1349, 12 L.Ed.2d 306 (1964).
 
 
 68
 WE AFFIRM.