850 F.2d 904
 57 USLW 2055, 57 USLW 2068, 1988-1 Trade
Cases 68,113,
11 Fed.R.Serv.3d 547, 7 U.S.P.Q.2d 1530
 The NATIONAL ASSOCIATION OF PHARMACEUTICAL MANUFACTURERS,
INC., and Zenith Laboratories, Inc., Plaintiffs-Appellants,
v.
AYERST LABORATORIES, DIVISION OF/AND AMERICAN HOME PRODUCTS
CORPORATION, Pharmacists Planning Service, Inc.
and Frederick S. Mayer, Defendants,
Ayerst Laboratories, Division of/and American Home Products
Corporation, Defendant-Appellee.
 No. 442, Docket 87-7710.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 30, 1987.
Decided June 22, 1988.
 
 Milton A. Bass, New York City (I. Scott Bass, Leslie B. Levine, Bass & Ullman, New York City, of counsel), for plaintiffs-appellants.
 Mark J. Spooner, Washington, D.C. (Stuart J. Land, Louis M. Bograd, Rebecca E. Swenson, Arnold & Porter, Washington, D.C., John C. Fleming, Jr., Bruce J. Banks, American Home Products Corp., New York City, of counsel), for defendant-appellee.
 Before PIERCE, MINER and DAVIS,* Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Southern District of New York, Kram, Judge, entered pursuant to an order of United States Magistrate Buchwald, dismissing appellants' complaint. The underlying dispute began in January, 1986, when appellee Ayerst Laboratories, Inc. ("Ayerst"), a division of American Home Products Corporation engaged in the manufacture and sale of brand name pharmaceuticals, sent a letter (the "January 1986 Letter" or the "Letter") to pharmacists throughout the United States discussing the merits of substituting a generic drug, propranolol hydrochloride ("propranolol"), for Ayerst's brand name product, Inderal. In response, appellants Zenith Laboratories, Inc. ("Zenith"), a manufacturer of generic drug products, and the National Association of Pharmaceutical Manufacturers ("NAPM"), an organization that represents generic drug companies, commenced the present action, alleging that Ayerst's publication of the January 1986 Letter constituted an unfair trade practice in violation of Sec. 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a) (1982). Zenith also claimed separately that publication of the Letter constituted an unlawful act of monopolization, in violation of Sec. 2 of the Sherman Act, 15 U.S.C. Sec. 2 (1982). Ayerst moved to dismiss or, in the alternative, for summary judgment. Upon consideration thereof, Magistrate Buchwald held that appellants lacked standing to assert their claims under both federal antitrust law and the Lanham Act. In the alternative, the magistrate held that, on the basis of the undisputed facts of the case, appellants could not prevail on either claim as a matter of law. For the reasons stated below, we reverse and remand.
 
 BACKGROUND
 
 2
 In 1967, the Food and Drug Administration ("FDA") first authorized Ayerst to market Inderal, the active ingredient of which is propranolol, for the treatment of arrythmia, a heart condition. Ayerst later obtained approval to market Inderal for the treatment of several other conditions, including hypertension and angina. In September 1983, Ayerst obtained approval to label and market Inderal for the treatment of persons who have suffered a prior heart attack; this is known as "post-myocardial infarction" or "post-MI" treatment. Until 1984, Ayerst was the only company authorized by the FDA to market propranolol for medicinal purposes.
 
 
 3
 In 1984, Congress amended the Food, Drug and Cosmetic Act ("FD & C Act"), 21 U.S.C. Sec. 355 et seq., and the federal patent laws, Title 35, U.S.C., by enacting the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585, also known as the Waxman-Hatch Act (the "Act"). The main purpose of the Act was to make available more low cost generic drugs by establishing a procedure for FDA approval of generic drugs. See 21 U.S.C. Sec. 355(j) (Supp. III 1985); H.R. No. 98-857, U.S.Code Cong. & Admin.News 1984, p. 2647. In addition, the Act extended the effective patent term available for companies that suffer the effect of delays incurred by product testing and regulatory approvals. 35 U.S.C. Sec. 156 (Supp. III 1985). Further, the Act provided that, if the FDA authorized any new use for an existing drug between January 1, 1982, and the date of enactment of the statute (September 24, 1984), the creator of the drug would have the exclusive right to label and market the drug for that indication until two years after the enactment date (that is, until September 24, 1986)--regardless of whether the underlying patent otherwise would have expired, and regardless of whether generic competitors could market the drug for other uses. See 21 U.S.C. Sec. 355(j)(4)(D)(v) (Supp. III 1985). Thus, when Ayerst's patent on propranolol expired in 1984, its competitors, including Zenith, began marketing generic propranolol for medicinal purposes. However, since Ayerst had obtained approval to market Inderal for a new use--post-MI treatment--between January 1982 and September 1984, Ayerst had the exclusive right under the Act to market its propranolol product for this use until September 1986.
 
 
 4
 According to Joseph Mahady, who served as American Home Products' Group Product Director for Inderal, Ayerst's January 1986 Letter was part of an ongoing "public debate within the pharmaceutical and medical communities regarding the merits of substitution" of generic products for brand name drugs. In October 1985, Martec Pharmaceuticals, the company for which Zenith distributes propranolol, sent a letter to California pharmacists stating that Martec/Zenith generic propranolol was "therapeutically equivalent" to Inderal, and that pharmacists could dispense Martec's propranolol "without fear." Soon afterwards, Lederle Laboratories, a division of American Cyanamid Company, sent a letter to pharmacists throughout the United States stating that "Lederle propranolol 'is considered to be therapeutically equivalent to InderalF.'"7 In response, Ayerst sent the January 1986 Letter, which reads as follows:
 
 Dear Pharmicist:
 
 5
 As you know, INDERALFistheonlybrand of propranolol HC1 tablets indicated to reduce mortality post-MI. Recently, questions have been raised on the significance of this exclusive claim to practicing pharmacists, particularly as it relates to potential liability resulting from substitution on INDERAL prescriptions.
 
 
 6
 Some generic manufacturers may tell you that the indication for which a drug is prescribed is confidential between the physician and the patient. We feel that the pharmacist is an equal member of the health care team, a respected professional who shares in protecting the health of the patient. Therefore, a brief review of the implications of exclusive labeling is appropriate.
 
 
 7
 The issue of possible liability associated with dispensing a generic drug for an indication not included in its labeling has not been resolved in the courts. It's not possible to determine, in advance, the outcome of a suit which may arise from such a situation. It is clear, however, that litigation is troublesome, expensive and will generate adverse publicity. Although some generic product manufacturers may be willing to indemnify for monetary awards, no company could adequately compensate you for the trouble and negative publicity that may result from a court case.
 
 
 8
 We believe that, consistent with prudent pharmacy practice, you will want to dispense INDERAL tablets, the only propranolol product with the approved indication for reduction of mortality post-MI.* If you know the patient is being treated for this condition, dispense only INDERAL. If you are considering substitution and don't know the condition being treated, take a few minutes to discuss the subject with your patient and the prescribing physician. Ayerst Laboratories considers pharmacists to be important members of the health-care profession. We support your need to be informed about critical issues regarding drug selection, and hope that we've helped to clarify the important issue of exclusive labeling.
 
 
 9
 Sincerely,
 
 Marvin A. Heuer, MD
 
 10
 In response to the January 1986 Letter, William V. Purvis, an official at the FDA's Office of Drug Standards, Division of Drug Advertising and Labeling, sent a letter (the "FDA Letter") to Ayerst in February 1986, claiming that the FDA regarded the January 1986 Letter to be false and misleading, in violation of Sec. 502(a) of the FD & C Act, 21 U.S.C. Sec. 352(a) (1982). The FDA raised three objections to the January 1986 Letter. First, the agency charged that Ayerst's use of the word "approved" (as in "We believe ... you will want to dispense INDERAL tablets, the only propranolol ... with the approved indication") violated Sec. 301(l) of the FD & C Act, 21 U.S.C. Sec. 331(l) (1982), which prohibits in any advertisement relating to a drug any representation or suggestion that the drug is approved or meets the requirements of Sec. 505 of the FD & C Act, 21 U.S.C. Sec. 355 (1982). Second, the agency stated that it regarded the January 1986 Letter's discussion of pharmacists' liability to be "an attempt to intimidate pharmacists to always dispense Inderal." The agency also took issue with the Letter's failure to "inform[ ] pharmacists that many states have enacted legislation that exempt [sic] pharmacists from liability through 'good faith' practice of generic substitution." Finally, the FDA Letter disputed Ayerst's suggestion that "If you know the patient is being treated for [post-MI], dispense only INDERAL." The FDA viewed this statement "as falsely suggesting that pharmacists must dispense Inderal for this condition," even though "[t]here are no laws, that we [the FDA] are aware of, requiring the pharmacists to take such action."
 
 
 11
 In June 1986, NAPM and Zenith commenced an action for damages and injunctive relief in the United States District Court for the Southern District of New York, alleging, inter alia, that Ayerst's publication of the January 1986 Letter constituted an unfair trade practice, in violation of Sec. 43(a) of the Lanham Act, because (1) the Letter was false and misleading, and (2) Ayerst intended that the Letter would impair the sales of generic propranolol. Appellants also claimed that Ayerst violated the Lanham Act by participating in the funding of "CUREP," an organization that allegedly "falsely describ[ed] propranolol," and that Ayerst engaged in other "attempts to falsely compare Inderal and generic competitors to an extent and at such times as are not presently known to plaintiffs." In addition, Zenith separately claimed that Ayerst engaged in the foregoing acts (1) to monopolize the sale of propranolol; (2) to eliminate and suppress competition in propranolol; (3) to inhibit potential competitors from entering the market for propranolol; and (4) to perpetuate unlawfully a patent monopoly, in violation of Sec. 2 of the Sherman Act, 15 U.S.C. Sec. 2.[1] By stipulation of the parties, Judge Kram ordered all pretrial matters, including motions of a substantive nature, referred to Magistrate Buchwald.
 
 
 12
 In October 1986, Ayerst moved to dismiss or, in the alternative, for summary judgment on both the Lanham Act and antitrust claims. Following a pretrial conference in January 1987, Magistrate Buchwald denied Ayerst's motion for summary judgment on the Sherman Act claim, on the ground that there remained genuine issues of material fact as to the characteristics of the market in which Inderal competes. The magistrate reserved judgment on all other issues, however, and later, on April 30, 1987, issued an opinion and order granting judgment in favor of Ayerst. The magistrate held, first, that Zenith lacked standing to assert its antitrust claim because it "d[id] not have a protectable [sic] interest in the sale of propranolol for post-MI indications." Second, the magistrate held that appellants lacked standing to assert their Lanham Act claim, because they lacked a "reasonable interest to be protected." In addition, the magistrate reasoned that "Ayerst's alleged conduct does not amount to anticompetitive conduct as a matter of law," and that the "allegations in plaintiffs' complaint simply do not allege a misrepresentation" sufficient for purposes of the Lanham Act claim. Judge Kram subsequently entered a judgment in favor of Ayerst pursuant to the magistrate's order. All causes of action having been dismissed herein and final judgment entered, this appeal followed.
 
 DISCUSSION
 
 13
 I. Consideration of Matters Outside the Complaint
 
 
 14
 On appeal Zenith and NAPM argue that the magistrate erred by considering certain matters outside the complaint in deciding Ayerst's motion. According to appellants, the complaint "clearly alleges that: (a) the [January 1986 L]etter effectively said to pharmacists that Ayerst's product was therapeutically superior to the generic and that they should not dispense generic propranolol for any indications (not just [post-]MI); and (b) the [L]etter was ... false and misleading." Appellants object to the magistrate's conclusions that the January 1986 Letter (1) "fairly states that the issues discussed are open ones"; (2) was sent "in the context of an ongoing public debate"; (3) was part of Ayerst's efforts "to compete aggressively on the merits"; (4) was in response to other letters; and (5) was, as a matter of law, not deceptive. Before we can address appellants' argument, we must discuss at some length precisely what extrinsic materials the magistrate considered.
 
 
 15
 On October 29, 1986, Ayerst filed a "notice of motion and motion to dismiss or, in the alternative, for summary judgment." The notice of motion stated, first, that "[s]ince the Complaint fails to state a claim against defendant upon which relief can be granted, this action should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure."[2] In the alternative, the notice of motion claimed that "[s]ince there are no genuine issues as to any material facts regarding this action, and since defendant is entitled to judgment on this action as a matter of law, summary judgment should be granted pursuant to Rule 56 of the Federal Rules of Civil Procedure."
 
 
 16
 Accompanying the notice of motion were two affidavits. The first affidavit (the "Mahady Affidavit"), which was signed by the aforementioned Joseph Mahady, claimed that the January 1986 Letter was merely part of an ongoing public debate relating to generic drugs. Copies of the letters sent by Martec Pharmaceuticals and Lederle Laboratories, as well as Ayerst's January 1986 Letter, were appended as exhibits to the Mahady Affidavit. The second affidavit (the "Gooen Affidavit"), which was signed by Ayerst executive Steven M. Gooen, was submitted as evidence of Ayerst's lack of monopoly power. The Gooen Affidavit claimed that Inderal competed with many other drugs, including "other beta-blockers and drugs from many other therapeutic classes," and concluded that Inderal had between an 8.5% and 29.2% share of the relevant market.
 
 
 17
 In support of its motion, Ayerst filed a memorandum of law and, in accordance with Local Rule 3(g) of the Civil Rules of the Southern District of New York, a "Statement of Material Facts as to Which There is No Genuine Issue to be Tried" ("Rule 3(g) Statement"). With respect to the Lanham Act claim, Ayerst's memorandum of law argued that: (1) the injury alleged in the complaint was not legally cognizable under the Lanham Act; (2) the January 1986 Letter made no false representations; and (3) the January 1986 Letter made no representations relating to the inherent quality or characteristics of Inderal. With respect to the antitrust claim, Ayerst argued that (1) Zenith had failed to allege two of the essential elements of a monopolization claim: (a) what the relevant market was, and (b) that Ayerst possessed monopoly power; and (2) in the alternative, summary judgment was appropriate because the undisputed facts demonstrated that Ayerst did not possess monopoly power. Finally, Ayerst's Rule 3(g) Statement claimed that there was no genuine issue of material fact as to Inderal's market share in the various markets in which Inderal competes. In response, appellants submitted, inter alia, a motion to compel discovery on the issue of Inderal's market share, and two memoranda of law in opposition to Ayerst's motion.
 
 
 18
 As noted above, in February 1987, Magistrate Buchwald denied summary judgment on the antitrust claim, reasoning that, despite the allegations set forth in the Gooen Affidavit and the Rule 3(g) Statement, the determination of the relevant market in which Inderal competes raised a disputed factual issue. While Zenith claimed that the relevant market was the market for propranolol, Ayerst argued that the relevant market was the market for all "beta blockers," a class of pharmaceutical products that includes propranolol as well as certain other drugs. In denying summary judgment on this aspect of Zenith's claim, the magistrate also denied appellant's motion to compel discovery on this issue as moot. Given that the magistrate denied Ayerst's motion for summary judgment on the market share issue, we do not understand Zenith to be arguing on appeal that the magistrate erred by considering the allegations set forth in the Gooen Affidavit.
 
 
 19
 In all other respects, however, appellants claim that "the Complaint [was] the only document that should have been examined."[3] In response, Ayerst claims that the magistrate's consideration of matters outside the pleadings in effect converted the motion to dismiss into a motion for summary judgment. Ayerst notes that, in connection with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), or a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), when "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." See, e.g., Villante v. Department of Corrections, 786 F.2d 516, 521 (2d Cir.1986); Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985). To determine whether the district court properly converted a 12(b)(6) or 12(c) motion into a motion for summary judgment, "[t]he essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir.1985), cert. denied, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). Resolution of this issue depends largely on the facts and circumstances of each case. Id., 770 F.2d at 295.
 
 
 20
 Several factors suggest that appellants should have been on notice that Ayerst's motion to dismiss might be converted into a motion for summary judgment. As this court has noted previously, "[e]ven where only the party moving to dismiss has submitted extrinsic material such as depositions or affidavits, the opposing party may be deemed to have had adequate notice that the motion to dismiss would be converted." Id. (citing Condon v. Local 2944, United Steelworkers of America, 683 F.2d 590, 593-94 (1st Cir.1982), and Cook v. Hirschberg, 258 F.2d 56, 57-58 (2d Cir.1958)). Among the factors suggesting that appellants were on notice are the following: (1) Ayerst styled its motion as a "motion to dismiss or, in the alternative, for summary judgment " (emphasis added); (2) the Mahady and Gooen affidavits were filed on the very same date as the notice of motion; and (3) Ayerst argued, in its memorandum of law, that as a matter of law the January 1986 Letter was not deceptive, and in so arguing Ayerst quoted extensively from the Letter itself and the other exhibits attached to the Mahady Affidavit. Additionally, we note that appellants have been represented by counsel throughout this litigation and are therefore not entitled to the deference which on occasion we have extended to pro se litigants who have claimed that a summary judgment conversion caught them by surprise. See, e.g., Chandler v. Coughlin, 763 F.2d 110, 113 (2d Cir.1985); Beacon Enters. v. Menzies, 715 F.2d 757, 767 (2d Cir.1983).
 
 
 21
 Nevertheless, despite the foregoing considerations, certain other factors lead us to conclude that appellants were not adequately notified that the magistrate would consider matters outside the pleadings. We note first that Ayerst's Rule 3(g) Statement addressed only the issue of Inderal's market share. Accordingly, appellants might reasonably have believed that Ayerst would not seek summary judgment on the other issues. Second, an affidavit Ayerst submitted on December 17, 1986, in opposition to appellants' motion to compel discovery stated that "[t]he only facts beyond the pleadings raised by Ayerst's pending motion are certain facts identifying Ayerst's share of the market in which Inderal competes." Again, we conclude that appellants might reasonably have understood this statement to mean that Ayerst was seeking summary judgment on the market share issue only. Third, we note that appellants stated in their memorandum of law in opposition to Ayerst's motion to dismiss the Lanham Act claim that they planned "to take discovery as to the impression Ayerst intended as a factor in determining whether the falsity [of the January 1986 Letter] did not relate to Inderal," but only if they survived the pending motion to dismiss. In other words, appellants made clear that they did not consider the motion then before the court to be a motion for summary judgment, except with respect to the market share issue. Accordingly, in our view conversion of the motion into a motion for summary judgment would have been inappropriate unless appellants had been timely notified that their impression was mistaken. We therefore hold that the magistrate erred by failing to notify appellants that she would be considering the contents of the Mahady Affidavit in connection with Ayerst's motion to dismiss.
 
 II. Standing
 A. Antitrust Standing
 
 22
 In relevant part, Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15 (1982), states that "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ..., and shall recover threefold the damages by him sustained...." Likewise, Sec. 16 of the Clayton Act, 15 U.S.C. Sec. 26 (1982), states that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...." Although a literal reading of these sections would provide a remedy to "any person" injured by an antitrust violation, courts have limited the scope of these provisions to particular classes of plaintiffs and for the redress of particular forms of injury. Thus, to recover damages under Sec. 4 or to qualify for injunctive relief under Sec. 16, a plaintiff "must show more than simply an 'injury causally linked' to" an antitrust violation; "instead, 'plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original)). Moreover, a demonstration of antitrust injury is necessary, but not always sufficient, to establish standing under Sec. 4 or Sec. 16, because a party who has suffered or is threatened with antitrust injury may not be a proper plaintiff for other reasons. Cargill, 107 S.Ct. at 489 nn. 5-6. Among the "other reasons" that might limit a plaintiff's right to recover are the directness or indirectness of the asserted injury; the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; the speculativeness of the alleged injury; and the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. See Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 540-45, 103 S.Ct. 897, 909-12, 74 L.Ed.2d 723 (1983).
 
 
 23
 In the present case, Zenith claims that "Ayerst intended by the [January 1986 Letter] to cause pharmacists to refrain from dispensing generic propranolol, to the benefit of sales of Inderal." Thus, according to the magistrate, the complaint states that the January 1986 Letter caused Zenith financial injury in two ways: first, by discouraging pharmacists from dispensing Zenith's generic propranolol for post-MI treatment; and second, by discouraging pharmacists from dispensing the drug for indications other than post-MI treatment. The magistrate reasoned, however, that Zenith lacked standing to assert a claim based on Ayerst's alleged disparagement of the use of propranolol for post-MI treatment, because the Waxman-Hatch Act specifically prohibited Zenith from labeling or advertising its generic propranolol for post-MI indications until September 1986. Thus, "even assuming arguendo a physician's right to dispense generic propranolol for post-MI patients and a pharmacist's right to substitute generic propranolol," the magistrate stated that Zenith would be "merely the incidental beneficiary of the acts of those third parties" with no legal right to recover for lost sales under Sec. 4. In addition, the magistrate held that Zenith lacked standing to assert a claim based on the effect of the January 1986 Letter on the sale of propranolol for indications other than post-MI treatment, because "[t]he causal connection between the Ayerst letter which states only dispense Inderal for post-MI patients, and Zenith's sales of generic propranolol for other purposes is too slender as a matter of law to allow plaintiffs [sic] standing (emphasis in original)."We disagree with the magistrate's conclusion that Zenith lacks standing to assert its antitrust claim. With respect to Zenith's claim that the Letter discouraged pharmacists from dispensing generic propranolol for post-MI treatment, we note that the magistrate was correct in stating that federal law prohibited Zenith from promoting or labeling its generic propranolol for post-MI indications. Nevertheless, nothing in the Waxman-Hatch Act prohibited Zenith from benefiting from the decisions of pharmacists to dispense the generic drug for post-MI use. Indeed, Zenith's complaint states that, under the laws of all fifty states and the District of Columbia, "a pharmacist may or must dispense a generic substitute for a prescription drug unless the physican indicates that substitution is prohibited." If this allegation is true, then in our view Zenith's loss of revenue from sales of propranolol for post-MI indications constitutes an injury "of the type the antitrust laws were intended to prevent." In other words, so long as neither federal nor state law prohibited the substitution of generic propranolol for post-MI indications, we believe that Zenith had a protectible interest in deriving revenue from the sale of propanolol for this use.
 
 
 24
 The cases cited by the magistrate and by Ayerst in support of the opposite view are distinguishable because, in each case, the alleged antitrust violations would have prevented the plaintiffs from receiving income to which they had no legal right. For example, in Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Co., 440 F.2d 36, 38 (10th Cir.), cert. denied, 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971), the court held that the operator of a shopping center could not assert an antitrust claim that an electrical utility had attempted to monopolize the market for electrical power at the center and had interfered with the operator's contracts to furnish electrical power on its own to mall tenants, but only because the operator itself had no right to provide electrical service until it had received permission from the state public service commission. Likewise, in Heath v. Aspen Skiing Corp., 325 F.Supp. 223, 232-33 (D.Colo.1971), the court held that a skiing instructor lacked antitrust standing to assert a right to conduct an independent ski school on lands to which the defendant corporations held Forest Service permits, but only because the instructor himself had no right to use the lands until he had obtained his own Forest Service permit. By contrast, in the present case, Zenith has alleged that it had a legal right to derive income from the sale of generic propranolol for post-MI treatment during the relevant time period, even though it had no right to market its product for this use. Under these unusual circumstances, we believe that Cottonwood Mall and Heath are inapposite.
 
 
 25
 In addition, we believe that Zenith's claim relating to sales of propranolol for post-MI treatment satisfies the second prong of the antitrust standing requirement under the "additional factors" set forth in Associated General Contractors. Given the allegation that the January 1986 Letter discouraged the use of propranolol for post-MI treatment, we think the resulting injury to generic manufacturers would be "direct," rather than speculative; we perceive no identifiable class of persons, apart from generic manufacturers, whose self-interest would motivate them to file suit against Ayerst; and we perceive no insurmountable problem in apportioning damages, in the event that Zenith were to prevail, so as to avoid duplicative recoveries.
 
 
 26
 Finally, we conclude that the magistrate erred by concluding that Zenith lacked standing to assert its claim that Ayerst violated the Sherman Act by discouraging pharmacists from dispensing generic propranolol for indications other than post-MI treatment. According to Magistrate Buchwald, the factors enunciated in Associated General Contractors weighed against Zenith because: (1) the causal connection between the alleged violation and the resulting injury was too remote, given that the Letter only directed pharmacists to avoid substitution for post-MI treatment; (2) the alleged injury was "indirect" and speculative; and (3) permitting the claim to go forward would risk duplicative recovery or complex damages apportionment. We disagree. Zenith claims that the Letter discouraged pharmacists from dispensing the generic drug altogether because, in many instances, pharmacists are not aware of the condition for which a physician has prescribed a given drug. Assuming, arguendo, that publication of the Letter violated the antitrust laws, we believe that Zenith has standing to assert that the Letter injured it in the manner alleged. We do not find Zenith's alleged loss of sales for conditions other than post-MI treatment so inherently "remote," "speculative," "indirect" or duplicative as to justify a finding that Zenith lacks antitrust standing to challenge the Letter.
 
 B. Lanham Act Standing
 1. Organizational Standing
 
 27
 As the magistrate noted, NAPM is a trade association for the generic pharmaceutical industry, and can therefore claim standing on behalf of its members if it meets three conditions: (1) if its members would otherwise have standing to sue in their own right; (2) if the interests it seeks to protect are germane to the organization's purpose; and (3) if neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See International Union, United Automobile Workers v. Brock, 477 U.S. 274, 282, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986) (citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). We agree with the magistrate's conclusion that NAPM meets the second prong of this test, because "[a]ny violation of law which infringed on the use of generic drugs would certainly harm the membership of NAPM and damage the interests germane to its purpose." We also agree that NAPM satisfies the third condition stated above, because "the plaintiffs have requested injunctive relief [and] there is no requirement of participation by individual members of NAPM in this lawsuit." NAPM's standing to litigate its claim therefore hinges on the first condition noted above, whether the members of NAPM have standing to sue in their own right. Consequently, since Zenith is a member of NAPM, NAPM has standing to the same extent that Zenith does. We turn now to consider whether Zenith, and concomitantly NAPM, has standing to assert the Lanham Act claim.
 
 2. Zenith's Lanham Act Standing
 
 28
 Under Sec. 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a) (1982), "[a]ny person who shall ... use in connection with any goods or services ... any false description ... and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation." Although the statute is intended to be broadly construed, see, e.g., PPX Enters. v. Audiofidelity, Inc., 746 F.2d 120, 124 (2d Cir.1984), a plaintiff must allege more than "mere subjective belief" about damages; "[w]hat matters is whether a commercial party has a 'reasonable interest to be protected' against the alleged false advertising." Id. at 125.
 
 
 29
 For essentially the same reasons that lead us to disagree with the magistrate's decision that Zenith lacked antitrust standing, we disagree with her ruling that appellants lack standing to assert their Lanham Act claim. The magistrate concluded that her "discussion of standing under the antitrust laws [was] equally applicable" to the issue of Lanham Act standing, because appellants had no "reasonable interest to be protected" under either the Clayton or Lanham Acts. For the reasons stated above, however, we conclude that appellants' alleged interest in benefiting from sales of generic propranolol is a legally protectible interest, even though appellants had no legal right to market their product for post-MI treatment. We therefore hold that appellants have standing under the Lanham Act, and we turn now to consider whether appellants have alleged sufficient facts in support of their claims.
 
 III. Zenith's Monopolization Claim
 
 30
 Although Magistrate Buchwald ruled that the complaint should bedismissed for lack of antitrust and Lanham Act standing, she considered in the alternative the merits of appellants' claims. Turning first to the Sherman Act claim, the magistrate correctly noted that monopoly in and of itself is not unlawful. Instead, the offense of monopoly under Sec. 2 of the Sherman Act consists of two elements: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966)). Alternatively, to prevail on an attempted monopolization claim, a plaintiff must prove three elements: (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a "dangerous probability" that the attempt would have succeeded. International Distrib. Centers v. Walsh Trucking Co., 812 F.2d 786, 790 (2d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). Proof of the first element of an attempted monopolization claim, anticompetitive conduct, may be used to infer the second element, specific intent to monopolize; and when coupled with proof of monopoly power, evidence of anticompetitive conduct may also prove a dangerous probability of success. Northeastern Tel. Co. v. American Tel. & Tel. Co., 651 F.2d 76, 85 (2d Cir.1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).
 
 
 31
 Applying the foregoing standards to the present case, the magistrate held that Zenith's Sec. 2 claim was deficient in two respects. First, the magistrate stated "that Ayerst's alleged conduct does not amount to anticompetitive conduct," or the willful maintenance of a monopoly, because the January 1986 Letter was not deceptive "as a matter of law." Second, she concluded that Zenith had failed to allege that Ayerst possessed monopoly power, as is required to state a claim for monopolization, or that Ayerst posed a dangerous probability of successfully implementing a monopoly, as is required to state a claim for attempted monopolization. For purposes of our analysis, we address these conclusions in reverse order.
 
 
 32
 Considering first the issue of monopoly power, we note that the magistrate made the following observations:
 
 
 33
 While plaintiffs [sic] allege that the intent of Ayerst's conduct was to obtain or maintain a monopoly in the manufacture and sale of propranolol, plaintiffs do not allege its success. Absent this allegation, we can only proceed on an attempted monopolization theory. However, to prevail on that theory, plaintiffs must demonstrate "that the defendant has a dangerous probability of monopolizing the market." ... Plaintiffs have failed to make this necessary allegation of Ayerst's probable success in monopolizing the propranolol market.
 
 
 34
 We disagree. Paragraph 61(d) of the complaint clearly alleges that Ayerst engaged in certain anticompetitive acts to "unlawfully perpetuate a patent monopoly in the sale of propranolol." (Emphasis added).) Ayerst could not "perpetuate" a monopoly unless the monopoly already was in existence. See Webster's Third New Int'l Dictionary 1685 (1981) (defining "perpetuate" as "to ... preserve from extinction [or] cause to last indefinitely").
 
 
 35
 Turning next to the element of anticompetitive conduct, we note that the magistrate concluded, after considering several factors, that Ayerst had not willfully maintained a monopoly. First, she noted that "Ayerst was the recipient of exclusivity protection afforded by the Government and designed to encourage its research efforts" during the period at issue. She observed that, until September 1986, Inderal was "admittedly the only propranolol which [was] indicated for the treatment of post-MI patients." From these facts the magistrate concluded that Ayerst's efforts to distinguish itself on this basis were merely competition on the merits. Second, in response to appellants' contention that the January 1986 Letter was false and misleading, and thus could not be characterized as competition on the merits, Magistrate Buchwald noted that only deceptive advertising can constitute anticompetitive conduct. According to the magistrate, however, the January 1986 Letter was not deceptive as a matter of law, and therefore Ayerst's decision to send the Letter was not anticompetitive. Finally, the magistrate concluded that "one letter sent in the context of an ongoing debate between the generic pharmaceutical manufacturers and brand name manufacturers ... is insufficient to violate the antitrust laws."
 
 
 36
 In response to the foregoing conclusions Zenith argues, first, that the magistrate erred to the extent she considered matters outside the pleadings. For the reasons stated in Section I of this opinion, we agree. In our view, Magistrate Buchwald should not have relied, as she did, on the Mahady Affidavit to conclude that the January 1986 Letter was "sent in the context of an ongoing debate" and therefore was insufficient to constitute a violation of the antitrust laws.
 
 
 37
 Zenith's claim that the magistrate erred in holding that the January 1986 Letter was not deceptive is somewhat more difficult to assess. As Zenith notes, the complaint alleges that the January 1986 Letter was false and misleading because it effectively told pharmacists that Inderal was therapeutically superior to generic propranolol, and that generic propranolol should not be dispensed for any indications. As noted above, however, we deem the January 1986 Letter to be part of the pleadings. We therefore cannot fault the magistrate for considering whether the Letter was false and misleading in the manner alleged in the complaint; the question before us is whether the magistrate was correct in concluding, as a matter of law, that publication of the Letter did not violate the Sherman Act.
 
 
 38
 As this court has recognized, "Advertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of Sec. 2 [of the Sherman Act]." Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 287-88 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Accordingly, a plaintiff asserting a monopolization claim based on misleading advertising must "overcome a presumption that the effect on competition of such a practice was de minimis." Id. at 288 n. 41 (citing 3 P. Areeda & D. Turner, Antitrust Law p 738a, at 278-79 (1978) ("Areeda & Turner")). The presumption is based on the perception that, while "[t]here is no redeeming virtue in deception, ... there is a social cost in litigation over it." Areeda & Turner p 738a, at 278. Thus, "[b]ecause the likelihood of a significant impact upon the opportunities of rivals is so small in most observed instances--and because the prevalence of arguably improper utterance is so great--the courts would be wise to regard misrepresentations as presumptively de minimis for Sec. 2 purposes." Id. at 279. Professors Areeda and Turner suggest that a plaintiff may overcome the de minimis presumption "by cumulative proof that the representations were clearly false, clearly material, clearly likely to induce reasonable reliance, made to buyers without knowledge of the subject matter, continued for prolonged periods, and not readily susceptible of neutralization or other offset by rivals." Id.; see also International Travel Arrangers, Inc. v. Western Airlines, 623 F.2d 1255, 1262-64, 1268 (8th Cir.) (publication of advertisement that was directed at general public and that was materially false and misleading, and that was part of a campaign against travel agents organizing charter flights, held to violate the Sherman Act), cert. denied, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980).
 
 
 39
 Taking the above factors into consideration, we believe that the magistrate should not have dismissed Zenith's claim that publication of the Letter violated Sec. 2. As noted, the FDA found the Letter to be false and misleading in certain respects; and, in our view, Zenith should be allowed to go forward with the discovery process to substantiate its claim that the Letter was clearly false, clearly material, and clearly likely to induce reasonable reliance. Moreover, Zenith might yet be able to be prove that the Letter was not readily susceptible of neutralization or other offset. On the other hand, we are inclined to agree with Ayerst that pharmacists are likely to have some knowledge of the subject matter discussed in the Letter, and that the representations set forth in the Letter were made, and could only have been made, for the short period of time during which Ayerst retained an exclusivity right under the Waxman-Hatch Act. Nevertheless, we believe that in the present case the several factors we have noted above cannot be adequately evaluated until the discovery process has moved forward to a greater extent than it has thus far. We therefore reverse the dismissal of Zenith's claim that publication of the January 1986 Letter violated the Sherman Act, though without prejudice to the filing of a motion for summary judgment at some future stage of the litigation.[4]
 
 IV. The Lanham Act Claim
 
 40
 As appellants note, Sec. 43(a) of the Lanham Act encompasses more than than literal falsehoods. "The truth or falsity of the advertisement usually should be tested by the reactions of the public." American Home Prods. v. Johnson & Johnson, 577 F.2d 160, 165 (2d Cir.1978). Nevertheless, to prevail on a misrepresentation claim under Sec. 43(a) of the Lanham Act, a plaintiff must prove that the defendant misrepresented an "inherent quality or characteristic" of the defendant's product. See, e.g., Vidal Sassoon, Inc. v. Bristol-Myers Co., 661 F.2d 272, 278 (2d Cir.1981).
 
 
 41
 In our view, appellants should be given the opportunity to develop their evidence that the January 1986 Letter misrepresented the inherent quality or characteristics of Inderal. Appellants claim that the Letter conveyed the false impression that Inderal is therapeutically superior to generic propranolol; whether or not pharmacists construed the Letter in this manner cannot be determined on consideration of a motion to dismiss. We therefore reverse the judgment in favor of Ayerst on the Lanham Act claim.
 
 CONCLUSION
 
 42
 For the reasons stated above, the judgment of the district court is reversed and this case is remanded for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Oscar H. Davis, United States Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation. Judge Davis participated in oral argument in this case and voted, before his death on June 19, 1988, in favor of the result reached in this opinion
 
 
 *
 See enclosed for prescribing information
 
 
 [1]
 Ayerst initially sought injunctive relief against and damages from two other parties as well, Pharmacists Planning Service, Inc. and its president, Frederick S. Mayer. Pursuant to a stipulation among the parties, Judge Kram dismissed the action as to each without prejudice on June 23, 1987
 
 
 [2]
 As Ayerst notes on appeal, technically the motion should have been styled as a Rule 12(c) motion for judgment on the pleadings, because the notice of motion was filed after Ayerst had filed its answer to the complaint. See Fed.R.Civ.P. 12(b); Falls Riverway Realty v. Niagara Falls, 754 F.2d 49, 53 (2d Cir.1985). Pursuant to Fed.R.Civ.P. 12(h)(2), however, a defense of failure to state a claim may be raised in a Rule 12(c) motion for judgment on the pleadings, and when this occurs the court simply treats the motion as if it were a motion to dismiss. See, e.g., George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 & n. 2 (2d Cir.1977)
 
 
 [3]
 Technically, the January 1986 Letter, which was submitted as an exhibit to the Mahady Affidavit, was a matter outside the pleadings. If appellants had appended the Letter as an exhibit to the complaint, however, or had expressly incorporated the Letter by reference into the complaint, the pleadings would be deemed to include the Letter. See Fed.R.Civ.P. 10(c); Goldman v. Belden, 754 F.2d 1059, 1065-66 (2d Cir.1985). Nonetheless the complaint clearly refers to the Letter, and there is no dispute as to the Letter's terms. Moreover, appellants did quote the entire text of the Letter in one of their memoranda of law in opposition to Ayerst's motion. Under these circumstances, we believe that the magistrate was authorized to treat the Letter as if it had been incorporated by reference into the complaint
 
 
 [4]
 The magistrate also held that Zenith's antitrust claim relating to Ayerst's funding of CUREP "falls woefully short of the use of 'third-party advertising,' which, in this context, by itself would not 'constitute a violation of the Sherman Act.' Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 141, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961)." In our view, this finding was inappropriate on a motion to dismiss. Summary judgment may be appropriate, however, if discovery indicates that this "advertising" does not overcome the de minimis presumption